Good morning, your honors. May it please the court, Alexandria Yates on behalf of defendant Helen Rhett Trujillo who's challenging his 24-month high-end guidelines sentence for conspiracy to possess counterfeit currency. Your honors, I'd like to address two issues today. The application of a five-level guidelines enhancement and also the procedural and substantive reasonableness of the high-end guidelines sentence. And unless the court prefers otherwise, I'll start with the guidelines. To make sure we're all on the same page, what I'm referring to is the 2B 5.1 B1a enhancement for either possessing materials used for counterfeiting or for manufacturing counterfeit currency. And the government is offering three reasons to support the district court's application of this five-level enhancement. I'd like to focus on Mr. Trujillo's possession of the so-called master bill because I think that's the most difficult issue. So there are two theories here. One is that the master bill itself is a material used for counterfeiting. And then the other is that the Mr. Trujillo's possession of the master bill is some level of evidence that he himself manufactured counterfeit currency. And let me dispense with the second argument first because there's simply no evidence in the record that Mr. Trujillo himself was the one who took this master bill and somehow converted it into into counterfeit currency. He equally could have been given this master bill. There's simply no evidence one way or the other, nothing more than speculation. So counsel, you concede that it was a master bill, right? I concede that the serial numbers match. And so clearly, in some way, shape or form, some person took this master bill and came up with counterfeit currency from it. I don't think that we can dispute that. But I don't think there's any evidence that Mr. Trujillo himself was the one who did that. So what that leaves us with is what I think is the real question, which is whether genuine United States currency can be a, quote, material used for counterfeiting. And no court has ever held as much. This court would be the first to do so, as far as I'm aware, if it did. And quite to the contrary, in a number of cases which we've cited in our briefing, where it's been clear that the defendant possessed a master bill, rather than saying that master bill is a material used for counterfeiting and thus the 2B5.1 enhancement applies, instead the court has struggled with whether something else, computer equipment, a green ink, for example, Xerox machine, is a material used for counterfeiting. Why couldn't it be? I'm sorry? Why wouldn't it be? Well, why wouldn't master bill? If it is indeed what you used to counterfeit, then why not? Well, our argument is that whoever did this counterfeiting, although the master bill was clearly involved, genuine United States currency does not meet the plain and ordinary meaning of a material used for counterfeiting. Is that that? Why not? Why can't, I mean, if you roll it up, if you roll up genuine U.S. currency into a nice, sharp little plane, poke somebody in the eye with it, could it be a material used to poke somebody in the eye? I suppose so. Yes, Your Honor. I think in that particular case, that would be that the U.S. currency was actively being employed, but what is actively being employed? Well, wasn't it actively being employed here? It had to be employed, did it not? Well, I think something else was actively being employed onto the genuine United States currency, or perhaps it was just being looked at, but I'm not sure that that qualifies as a material used. Wait a minute. The United States currency is transferred onto this washed out other currency, right? That's what they've done. They've transferred the image onto the other, and the U.S. currency didn't have to even be employed to accomplish that? Tell me why not. Well, it's not clear that it was directly transferred, or as opposed to someone looked at it and copied a serial number. I don't think that's clear from the record. How? How would you copy serial numbers without using the currency, the genuine currency? How would you copy? You couldn't hand copy it, for sure. Well, again, the record's not clear, but my understanding is that there could be computer programs that are used for manufacturing currency, and generally computers and printers are involved in this, and that someone could simply be reading a serial number and inputting it into that. But wouldn't that be use of the currency if you took a serial number that was legitimate from currency and then transposed it onto counterfeit money? Wouldn't that be using the genuine currency? Well, I think that's at least ambiguous, and ambiguity, of course, under the rule of lenity should go in Mr. Trujillo's favor. Well, that's how the washing is supposed to work. You wash off another bill, and then you take the real one, the U.S. currency, and you transfer its image onto the other bill. Well, that's what the evidence shows. That's how you do the washing process. I understand Your Honor's point. I think it's curious, though, if that is a very plain and obvious meaning of the term, that in none of these other Federal cases was this cited as a material used for counterfeiting. The machinations of man have no limit. New things come up every moment. I would also note, Your Honor, that if we're purely talking about Mr. Trujillo's possession of a material used for counterfeiting, and if this Court believes that the genuine United States currency actually qualifies as that material, I think that there would need to be some level of knowledge there. We don't read statutes and also guidelines as strict liability, and there's no evidence that even if this genuine U.S. currency was a material used for counterfeiting, and even if Mr. Trujillo possessed it, that he knew that that's what it had been used for, that he knew it was a material used for counterfeiting. What do we do with the evidence from his girlfriend? I think we discount it entirely, as did the District Court, Your Honor, and there's several reasons for that. First of all, it's hearsay, out of court, never subject to cross-examination, not sworn by a woman who was presumably on drugs at the time, is a drug addict, who the District Court made a, in another context, a negative credibility finding against. And so I think the District Court rightly discounted that and said that the Court was making its finding based only on the uncontested evidence, and of course, that was something that had been strongly contested. But of course, hearsay is admissible in determining sentencing enhancements. It is, but the question, but only, it's only relevant to support a guideline if it's reliable, and there's no evidence of reliability here. Quite the contrary, Ms. Vignell is somebody who, both the government has argued and the District Court has found, lies under oath, perjures herself. So I don't think that there's any reliability to that, and it was a statement made in the course of downplaying her involvement through the course of another lie where she said- It's just hard, counsel, when you start adding up the tied pens, the pen in the garbage, the other pens, her description that he's been counterfeiting stuff as long as she's been with him, that they, together, it's very clear that the two of them went to Target, distributed these $100 bills, I mean, there's just this ongoing pattern. It just, it just, it looks pretty reliable. In fact, it's, it's almost incredible to, for, if she, if she denied that he had made any of this stuff. I understand, Your Honor. Our position is that, first of all, that Ms. Vignell's statement is, is, is not something the District Court considered, and certainly given the District Court's negative credibility finding, it would be inappropriate for this Court to then consider it. Taking the rest of the evidence, I, I see it as less incriminating than, than the, this Court's case, Allen, which I think has to be the benchmark. There, the defendant was convicted of selling what he knew to be several counterfeit bills, and when they searched the trash in his home, they found items that didn't have plausible general uses, but were incredibly incriminating as going towards counterfeiting. And in that case, this Court held that that wasn't enough, that circumstantial evidence, that there had to be some more link. Perhaps it would be wise for me to turn, Your Honor, to, to the second argument, which is the procedural and substantive reasonableness. Just briefly, because my time is low, I think the two most important points here are that the District Court outright refused to consider Mr. Trujillo's past history of productive citizenship, and didn't properly recognize the relevance of his profound rehabilitation to the majority of the 3553A factors in the way that the Supreme Court in Pepper has said is required. And I'd like to reserve the balance of my time. Of course. Thank you. May it please the Court, Ben Mattal on behalf of the United States. The facts of this case were largely undisputed in front of the District Court. The question here is whether the District Court clearly committed error based on the factual findings the District Court made when it applied the five-level enhancement for the manufacturing of currency. The government submits that there was ample evidence before the District Court to support that finding. And that finding was related to whether the defendant manufactured and produced counterfeit cash, as well as a finding related to the materials used for counterfeiting. Before the District Court was the pattern note or master note that was found on him on the day of his arrest. In addition, that pattern note or master bill was found in six other bills, essentially being used in six other places. There was two counterfeit bills. Counsel, do we know for sure what the process was for manufacturing the counterfeit notes, whoever did it? In terms of the technical process, there is statements from Agent Hoffman in the complaint, as well as mentioned in the PSR that describe that process. There was discussion during the sentencing hearing about how that process occurred. And there was no dispute about the defendant using- And the process was what? That you took the tied pens, washed a five-dollar bill? It was a bleaching process. As the co-defendant described it, he used Easy Off in that instance she had seen, where he would bleach a five-dollar bill, a genuine five-dollar bill, and take a genuine hundred-dollar bill, and use that to create the counterfeit hundred-dollar bills, essentially resulting in a $95 gain. So how would the hundred-dollar bill, the counterfeit hundred-dollar bill, be created? Your Honor, this is something we had raised with the District Court and had agents prepared to testify about at the sentencing hearing. However, given that there was no dispute, the District Court elected not to have that testimony heard. The process would involve using the glue tape and using the bleached five-dollar bill, where the glue tape or some sort of adhesive would be placed on a piece of paper. It would be stuck to the piece of paper, the bleached-out five-dollar bill. Previously, they would scan in the genuine one in the same place, and so that when the printer is run through, the now counterfeited hundred-dollar bill would have the exact same placement. It would be superimposed over the bleached-out five-dollar bill. Yes, Your Honor. That was what was consistent in this case. Even the passes that occurred at Target and Nordstrom's, each of those were bleached five-dollar bills. In each instance, there was an Abraham Lincoln watermark. There was a five-dollar security strip. So this was the mode of operation that the defendant used even before the day of his arrest and the search of his motel room and his vehicle, which all had counterfeit bills. In looking at the co-defendant's statement, as the Court has recognized, her statement was entirely consistent with the evidence that was found that day and previously. Did the District Court rely on her statement or discuss her statement at all regarding the counterfeiting activities? Your Honor, there was discussion at the start of the — when the issue of the guideline was raised, the objection, there was discussion about whether the government was submitting that it was reliable. The colloquy kind of turned more towards the masternode. I think that's what was very persuasive to the District Court. However, later, the District Court did raise her statement again, not in the context of the counterfeiting. He raised it in terms of when he was looking at the 3553A factors and looking at the prescription fraud that the defendant was involved in. He raised it himself. He actually asked the parties if that statement was disputed. The government acknowledged that we did not believe that portion of the statement was disputed. And there was no dispute raised at that time to the co-defendant's statement regarding the — Did the District Court make any sort of credibility determination regarding the statements of the co-defendant vis-à-vis the counterfeiting activities? No, Your Honor. The government submitted — he did not. The only credibility finding that was made was respect to, in a different proceeding, her allegation that she was not advised of Miranda rights. He did find the agent credible at a suppression hearing and discredited her testimony that she was not advised of Miranda rights. He did also describe the conduct, which we would submit was consistent with the co-defendant's description. He described her — his substantial use of — substantial period of time's language he used on a somewhat endemic basis, just like the co-defendant had suggested that the defendant was using counterfeit cash for as long as she had known him. In addition, when we look at what was found in the motel room, that further supports the finding that the District Court made with regard to manufacturing and production of counterfeit cash. These were the items that a Secret Service agent had identified as being used to manufacture and bleach genuine bills. There is this kind of question about whether, under 2B5.1b2a, whether it was manufacturing and producing counterfeit cash or a material being used. There's at least three instances where the District Court refers to the defendant as manufacturing cash, indicating that the District Court found that he was manufacturing and producing cash as opposed to merely possessing materials used for counterfeiting. That said, the government would submit that he did possess materials used for counterfeiting. As this Court noted, the master note should be considered a material used for counterfeiting. There's simply no real way to do this process without starting with some sort of genuine bill. Defense counsel had argued that there was no evidence that the defendant had used the bill. The government would submit that there is actually evidence, given the fact that he had the master bill as well as the counterfeit cash on him. But that's besides the point, given that Allen didn't require that the defendant who possessed the material actually was the one who used the counterfeiting. The language in the case is clear that it's just a material used for counterfeiting by somebody. In this case, somebody used it to create at least six counterfeit bills. Just to respond to the evidence of knowledge, whether the defendant actually knew if it was used, he had also used these types of bills eight different occasions, which would suggest that he was, in fact, using these counterfeit bills. Just to briefly respond to the procedural reasonableness argument that was raised, I think it's clear from the record that the district court did engage with defense counsel and consider these different arguments raised, but simply rejected them and did not accept the nine-level downward variance that was being asked for by the defendant. Unless the court has further questions, the government would submit on its briefs and today's argument. Thank you. It appears not. Thank you, counsel. The bottle. Thank you, Your Honor. Just briefly on the guidelines issue, much of what my colleague just said today about the process that is used is nowhere in the record. I've never read any of this. It was undisputed that many of these items are the types that could be used. But, of course, this process that was just described now would involve a printer, computer, some other technology that was never found. None of that was in the PSR? None of the details about the process. In fact, I don't even know if that's true about how the glue tape works. That is not in the PSR. But just to go back to the pepper issue, because perhaps that's the best area of my focus, I would encourage this Court to take note of the Seventh Circuit decision, Robertson, which we've cited in our briefs, which does exactly what we're asking the Court to do here. Which is, in that case, clearly the District Court listened to arguments about rehabilitation, considered them. But what the Seventh Circuit said was, under pepper, you need to take these more seriously. They're relevant to all sorts of 3553A factors. You need to sentence the defendant as he stands before you now, not as he was back at the time of the crime. And because the District Court in Robertson had not adequately considered the rehabilitation as it related to all of the 3553A factors, as the pepper court said, the District Court must. The Seventh Circuit reversed. And that's exactly the problem here, Your Honors. The District Court commended Mr. Trujillo on his rehabilitation, as had the District Court in pepper. But chastised, essentially, defense counsel for focusing on that rehabilitation, saying it was relevant to nothing more than his history and characteristics, and there were all of these other factors to consider. And pepper tells us that that's precisely wrong. And so, regardless of the guidelines range, we believe a new hearing is required for sentencing. Unless the Court has further questions. It appears not. Thank you, counsel. Thank you, Your Honor. Thank you to both counsel, in case this argument is submitted for decision by the Court.
judges: Fernandez, Rawlinson, Bybee